UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 06-10889 (MS) |
| | . | |
| | . | |
| PITTRA G.B. | . | M.L.K. Federal Building |
| INTERNATIONAL, INC., | . | 50 Walnut Street, 3rd Floor |
| | . | Newark, NJ 07102 |
| Debtor. | . | |
| | . | December 3, 2007 |
| . . . . . . . . . . . . | . | 1:18 p.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE MORRIS STERN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Trustee:          Robertson, Frellich, Bruno & Cohen
                          By:  JAMES A. SCARPONE, ESQ.
                          One Riverfront Plaza, 7th Floor
                          Newark, NJ 07102-5497

                          Hellring Lindeman Goldstein &
                            Siegal LLP
                          By:  PATRICIA A. STAIANO, ESQ.
                          One Gateway Center, 8th Floor
                          Newark, NJ 07102

                          Benjamin A. Stanziale
                          By:  BENJAMIN A. STANZIALE, ESQ.
                          91 Main Street
                          West Orange, NJ 07052-5403

Audio Operator:          Mariela Primo

Proceedings recorded by electronic sound recording, transcript
        produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311     Fax No. (609) 587-3599

APPEARANCES (CONT'D):

For Merrill Lynch:          Bressler, Amery & Ross, P.C.
                            By:  GEORGE R. HIRSCH, ESQ.
                            325 Columbia Turnpike
                            Florham Park, NJ 07932

As an observer:             Saiber Schlesinger Satz &
                              Goldstein, LLC
                            By:  VINCENT F. PAPALIA, ESQ.
                            One Gateway Center
                            13th Floor
                            Newark, NJ 07102-5311

1          THE COURT:  This United States Bankruptcy Court is

2  now in session.  The scheduled matters will be heard and fully

3  considered.  This is the one o'clock calendar, Pittra.  We have

4  two motions.  Appearances, please.

5          MR. SCARPONE:  James Scarpone, Robertson, Frellich,

6  Bruno & Cohen for the trustee.  Also here is Patricia Staiano

7  from Hellring Lindeman, and the trustee, Benjamin Stanziale.

8          THE COURT:  All right.

9          MR. HIRSCH:  George Hirsch, Bresler, Amery & Ross for

10  Merrill Lynch Business Financial Services, Inc.

11          MR. PAPALIA:  Good afternoon, Your Honor.  Vincent

12  Papalia, Saiber Schlesinger.  I'm here as an observer.  I'm not

13  participating in the motion.

14          THE COURT:  Oh my goodness.  Okay.

15          MR. PAPALIA:  Thank you.

16          THE COURT:  All right.  Okay.

17          MR. SCARPONE:  Excuse me, Your Honor.  There was one

18  other counsel who my secretary told me when she received word

19  from him that he intended to appear today.  But, he's not here

20  and I'm not 100 percent sure if he's coming, so I think we can

21  proceed.  It's past the time, he was told what time it was.

22          THE COURT:  All right.  I mean, I --

23          MR. SCARPONE:  That was Mr. Gleason who represents

24  Empresas Lourdes in the larger claim.

25          THE COURT:  All right.  We'll keep him posted on

4

1  what's doing.  All right.  I'll hear the motion to dismiss

2  first.  I reviewed all the material that was submitted.  Mr.

3  Hirsch, why doesn't the declaration of Ms. Krellman (phonetic)

4  sort of put to rest the issue of authorization to file the

5  petition?

6          MR. HIRSCH:  Your Honor, if the declaration of Ms.

7  Krellman stood alone one could conclude that there was no

8  reason to question whether or not the declaration was accurate,

9  truthful.  The history here, however, raises that question on

10  Pages 3 and 4 of the reply declaration.  I went through the

11  facts and there was one that I left out and I just would go

12  through those very quickly.

13          THE COURT:  Sure.

14          MR. HIRSCH:  And it's really up to the Court to

15  decide whether there is a credibility issue here.  We believe

16  there is.  First, there are these letters that purport to be

17  resignations and sale of stock.  However, subsequent -- that

18  was in -- dated November 1, 2004, purportedly.  Subsequent to

19  that date, May 26, 2005, there's a financial statement which,

20  on its face, is from Paulette Krellman, and it was submitted

21  and it was presented to my client as purporting to be from

22  Paulette Krellman, and it states that she owns the stock and

23  continues to be a partner, member or officer of Pittra G.B.

24  International, Inc.  And that is -- that document is attached

25  to the initial filing.

J&J COURT TRANSCRIBERS, INC.

1            So, that document, if Paulette Krellman signed it, is

2  inconsistent with the resignation letter and sale letter.  And

3  if Mr. Kupperman did it for Ms. Krellman it's almost

4  inconsistent with the resignation and sale letter.

5            At the same time, and this is what I left out and

6  it's attached as Exhibit F to the initial declaration, Mr.

7  Kupperman provided a financial statement in May of 2005.  It

8  was actually received, I think, at the beginning of June.  It's

9  Exhibit F.  And Mr. Kupperman does not reflect the ownership of

10 the Pittra stock that he purportedly acquired in November of

11 2004.  So, that Kupperman financial --

12            THE COURT:  Why should I focus on the stock at all?

13            MR. HIRSCH:  It's because the sale of the stock and

14 the resignation as a director were purportedly contemporaneous

15 and presumably connected with each other.

16            THE COURT:  Two different transmissions.

17            MR. HIRSCH:  On the same date, the same time, the

18 same formal letter.

19            THE COURT:  Okay.  So, you say it's a credibility

20 issue.  Okay.  I hear you.

21            MR. HIRSCH:  Okay.

22            THE COURT:  I understand the shadows, but again, you

23 may have -- you know, stock is a funny thing in terms of

24 declaration of whether you own it or not.  Was it transferred

25 on the books?  You know, you can have --

1          MR. HIRSCH:  Right.

2          THE COURT:  -- shades of stock ownership.  In

3   addition, the statement, although I, you know, I agree that

4   you've, in this sense, have sort of the higher hand in the

5   argument on -- just on the face of the document, the personal

6   financial statements submitted.  It doesn't say director in the

7   question that is answered by the purported submitter, Ms.

8   Krellman.

9          MR. HIRSCH:  Your Honor, I'm not -- I want to make

10  our position clear.

11         THE COURT:  Go ahead.

12         MR. HIRSCH:  We're not, in a sense, prosecuting this

13  motion.  We are calling these facts to the attention of the

14  Court.  We believe that notwithstanding the declaration, that

15  because of the other documents, even viewed with the

16  declaration, there are sufficient inconsistencies that there is

17  a credibility issue that -- and that this can not be decided

18  based on, well, there are all these documents, but she

19  submitted a declaration that, you know, now she says this is

20  the way it was.

21         THE COURT:  Is there any reason to believe that if

22  she were a director, even through today, that she wouldn't

23  ratify what happened in terms of the authorization of the

24  petition?

25         MR. HIRSCH:  I have no way of knowing that one way or

1   the other.  I do note that in her 2004 examination in her own

2   case -- and I asked her several times -- she purported not to

3   remember whether she was a director or shareholder of Pittra

4   G.B. International, Inc.  And what I tend to think about these

5   defendants is that what's convenient at the time the question

6   is asked?  I think that she would rather not say that I lied in

7   a financial statement to a banking institution.  So, she says,

8   "I didn't sign that one."  But, whether or not she signed the

9   resignation is in serious question, and it really is a

10  credibility question from our point of view.  But, that's the

11  Court's call.

12          THE COURT:  Okay.  But, let me just -- because we

13  may -- we have seen the statement, for example, of Mr. Becker

14  as to the use of his letterhead to forge a submission to a

15  would be lender or a lender.  And so, I understand that there's

16  not exactly a pristine background here.

17          On the other hand, the question is whether there's

18  authority for the filing of this petition, and that's the

19  narrowest of questions.  And for a creditor a year later --

20  more than a year.  The petition was filed 2/06.  To say well,

21  you know, let's throw the case out, it's not as though Ms.

22  Krellman is getting up saying, you know, I was a director, and

23  I didn't attend that meeting, and there was no quorum, and it's

24  not authorized, and this case should be dismissed.

25          MR. HIRSCH:  I understand.

8

1          THE COURT:  So, there's sort of an -- the Court

2    has -- it's also not the case that Ms. Krellman is saying today

3    that whether or not she wants the case dismissed, that she

4    wouldn't, if she were director, ratifying that.  And I know

5    that there's sort of a speckled history with respect to

6    ratification, but this is a court of equity almost two years

7    into a case, and for this highly technical, though

8    appropriate -- it's an appropriate objection --

9          MR. HIRSCH:  When you say -- you mean -- you said --

10   you used the word -- you said a an, a-n, appropriate?

11         THE COURT:  It is appropriate.

12         MR. HIRSCH:  Okay.

13         THE COURT:  Yes, no, no, I --

14         MR. HIRSCH:  It sounded like inappropriate --

15         THE COURT:  No, no, no.  Inappropriate I say louder.

16   You know, appropriate I say softly.  It's an appropriate -- it

17   is an appropriate motion, but I think that once Ms. Krellman

18   came forward and said that she had transferred the stock, but

19   most importantly, because the stock isn't really the issue, in

20   a separate transmission that she had resigned as director, and

21   that there is on the other side of it a series of e-mails, one

22   or two around the date of the petition between Kupperman and

23   the Becker Meisel office, sort of reaffirming that.

24         And so, you've got two things on your side of the

25   ledger which is this now disputed financial statement for

1  whatever that's worth, and the statement in the -- statement of

2  financial affairs by Ms. Krellman which -- she doesn't have a

3  start date for her share ownerships.

4           MR. HIRSCH:  She doesn't have an end date.

5           THE COURT:  So, she doesn't have an end date either.

6  So, she left that date line out.  Again, your point may be

7  correct that not answering and committing to a lot of facts is

8  probably a good way to dodge one or another arrow, liability,

9  whatever, but on the face of what we have here in answering the

10 very, very narrow question of authorization, I can't see how we

11 could say that this is not an authorized petition, and I can't

12 dismiss it.  So, I'm going to have to deny your motion.

13          MR. HIRSCH:  All right.  Well --

14          THE COURT:  I mean --

15          MR. HIRSCH:  I guess you ruled, so -- I mean, there

16 were a couple of things that I would say; one is that --

17          THE COURT:  Go ahead.

18          MR. HIRSCH:  -- that the question of authorization

19 doesn't depend on who's raising it and when, and secondly --

20          THE COURT:  But, there are cases that do --

21          MR. HIRSCH:  I understand, but I --

22          THE COURT:  -- that do go to the issue of -- sort of

23 one's motivation.  I mean, why do you want this case dismissed?

24 So, you don't have the adversary proceeding staring you in the

25 face.

1          MR. HIRSCH:  We -- there is no adversary proceeding.

2          THE COURT:  I'm saying the potential.

3          MR. HIRSCH:  Frankly, Your Honor, we are not

4   concerned, and if the trustee and his counsel want to exert

5   more effort and run up bigger expenses in what is likely to be

6   a no-asset case where they're staring at, you know, the big

7   goose egg, you know, that's really up to them and, you know,

8   I'm in a position where, okay, we'll deal with it.

9          THE COURT:  Okay.

10          MR. HIRSCH:  But, the only other thing I want to say

11   is --

12          THE COURT:  Sure.

13          MR. HIRSCH:  -- the Kupperman e-mails, you know,

14   Kupperman's the kind of guy that, apparently the facts seem to

15   suggest, that if you say to Kupperman, listen, I need a

16   document that shows that you have the authority to do this,

17   he'll say, oh, no problem, I have it.  And he'll wheel it up

18   whether or not it's authentic.  But, I --

19          THE COURT:  Yes.  If it were only that.  But, now you

20   have Ms. Krellman in a declaration.  I mean, there it is.  If

21   you put her on the stand are we going to get a different

22   answer?

23          MR. HIRSCH:  I doubt you'll get a different answer

24   and it's just a question of whether Your Honor feels the need

25   to assess her credibility.  Your Honor apparently doesn't and I

1    accept that.

2         THE COURT:  Okay.  All right.  Thank you.  Is there

3    anything left of the motion with respect to discovery?

4         MR. SCARPONE:  Judge, we have a motion for the

5    discovery and Mr. Hirsch has an argument about why some of that

6    discovery should not be allowed.

7         THE COURT:  All right.  I didn't know if there was

8    still a dispute because I saw a letter from Mr. Hirsch that

9    said 1368 pages had been submitted roughly contemporaneously

10   with the motion being scheduled.

11        MR. SCARPONE:  There's two issues, Judge.

12        THE COURT:  Production of the officer and the --

13        MR. SCARPONE:  Witness and the operating manuals that

14   tell us what the standard procedure is which makes it possible

15   for us to understand what this stack -- and the stack's about

16   that high, Judge.  He sends a lot of paper.  There isn't a

17   staple or a paperclip in the pile.  Now, that tells you

18   something, Judge.  Production without staples and paperclips is

19   always the key indicator, Judge.

20        THE COURT:  Yes.  I certainly saw no contempt in this

21   until you pointed out that he wouldn't supply the stapler or a

22   paperclip, but look, it's -- I think that you've pushed the

23   issue of the 2004 pretty much to its limit.  If, at this point,

24   you want to file the adversary proceeding and have discovery on

25   that basis, that's more appropriate, but go ahead.

1          MR. SCARPONE:  Judge, let me address that for a

2   moment because I have a fundamentally disagreement with Mr.

3   Hirsch.  I mean, just as on the last motion, Mr. Hirsch

4   confuses Mr. Hirsch confuses credibility with evidence.  You

5   know as the old saying goes, even the broken clock is right

6   twice a day.  Okay, just because Artie Kupperman has lied in

7   the past doesn't mean he's lying now.

8          Proof that he is lacking in fundamental credibility

9   comes easy in this case.  We gave it to him.  We would've

10  wanted -- it was the trustee who found the evidence of the

11  lying here, and we immediately gave it to the secure lenders

12  who were still advancing money to him at the time.  But, proof

13  that Artie Kupperman has in the past lied, committed frauds,

14  served time in prison for embezzlement doesn't mean or doesn't

15  equate to proof of his authorization of filing a bankruptcy

16  petition.

17          Now, likewise, on the discovery motion, we -- I

18  believe firmly, get your facts first before you file a

19  pleading.  Don't go running off and starting adversary

20  proceedings.  Rule 2004 provides a procedure by which a trustee

21  can do a fundamental investigation into the assets and the

22  business affairs of a debtor.

23          And what we proposed to do here was, I believe, very

24  much in line with the basic purpose of that rule.  We want to

25  find out whether there is a basis to challenge their lien.

1   Before we challenge it, not challenge first, find out later

2   whether you have any facts that support your position.  We

3   represent the trustee, not the debtor who dealt with him.  Not

4   the man who deceived this lender for so many years.  We

5   represented trustee.

6           THE COURT:  But, what is the, as you see it today,

7   and if you choose, and I use that term advisedly, if you choose

8   to advance it, what is your theory in challenging or

9   potentially challenging their lien?  I mean, you've got, I

10  assume, and I may be wrong on this, and the lack of separation

11  by whatever folder or staple or paperclip may make a

12  difference, but --

13          MR. SCARPONE:  Obviously, Judge --

14          THE COURT:  -- are you able to look at the loan

15  documents?  I mean, is it a question of loan documentation?  Is

16  it a question of defection?  Is it a question of signature?

17  What's the issue on the lien?  A question of consideration?

18          MR. SCARPONE:  None of the above.

19          THE COURT:  Value?  None of the above.

20          MR. SCARPONE:  None of the above.

21          THE COURT:  Okay.

22          MR. SCARPONE:  Where I start is a question Your Honor

23  asked the first time we set foot in this courtroom on this

24  case.

25          THE COURT:  We're not going to talk about the rabbit

1 again.  You catch the rabbit first.  I don't --

2          MR. SCARPONE:  I don't recall that, Judge, but --

3          THE COURT:  -- know if you recall that.

4          MR. SCARPONE:  -- that's not what I'm talking about.

5          THE COURT:  Well, that was Mr. Hirsch's point.

6          MR. HIRSCH:  And, Your Honor --

7          THE COURT:  Let us first catch the rabbit before we

8 cook it.  Quoting a barred David Raven.

9          MR. HIRSCH:  The rabbit's long gone, Your Honor.

10          THE COURT:  Okay.

11          MR. SCARPONE:  Judge --

12          MR. HIRSCH:  And Mr. Papalia will probably join me in

13 that.

14          MR. SCARPONE:  Judge --

15          THE COURT:  Go ahead.

16          MR. SCARPONE:  -- what I'm talking about is a comment

17 Your Honor made the first time we were here.  And we advised

18 the Court in the context of a totally different motion that the

19 debtor had -- someone had created totally fraudulent financial

20 statements; opinion letters from counsel, phony documents from

21 a bank indicating a $10 million escrow account on a closing for

22 the sale of the business.  I mean, it was so much fraud it was

23 funny.  It was comical.  And that, in fact, Merrill Lynch, the

24 secured lender, had been advancing funds and, in fact, even

25 increased the debtor's line of credit after the debtor had

ceased doing business and transferred all of his assets to
another entity.

      And Your Honor looked at us and said -- or, looked at
Mr. Hirsch, actually, as I recall, and said, "Mr. Hirsch, what
was Merrill Lynch doing here?"  Well, that question has stuck
with us, not just because the Court said it, but because it's a
fundamental question.  How could this happen?  This is a court
of equity.  We're not challenging the -- we're not contesting
that they loaned money to this debtor.  What we're questioning
is the enforceability of their lien at this point in time given
their apparent complete disregard of a series of glaring red
warning lights here where their failure to do anything that
comports with normal lending practices in financial
institutions.

      The trustee, in 20 minutes on his computer, found out
that Arthur Kupperman had served time for embezzlement.  That
he had just come out of a personal bankruptcy.  Merrill Lynch
didn't know.  They didn't even know that this case had been
filed until we told them.  Till they got -- they got a Rule
2004 notice from us years ago asking for the loan documents.
That's how they learned of the bankruptcy filing.  They
didn't -- they were --

      THE COURT:  Okay.  But, let's assume something.
Let's assume you got the -- their guidebook, you know, the Boy
Scout manual of Merrill Lynch which says specifically, thou

1  shalt not make a loan to anyone who has been in bankruptcy

2  within the last X months, forgetting about what the bankruptcy

3  code --

4          MR. SCARPONE:  Your Honor, let me give you a better

5  example --

6          THE COURT:  Let me just go down the list.

7          MR. SCARPONE:  -- of factual --

8          THE COURT:  Have all this stuff, and they violated

9  every one of their own internal rules.  Every one.  And they

10  made the loan, and the loan was properly documented and it was

11  properly perfected, so you have both the grant and the

12  perfection, if there is any collateral, where's the cause of

13  action?

14          MR. SCARPONE:  The cause of action is an equitable

15  action that says they're not entitled to the equitable remedy

16  of foreclosure.  They're not entitled to enforce their lien.

17          THE COURT:  And where does that come from

18          MR. SCARPONE:  It comes from --

19          THE COURT:  -- stupidity?  I mean, they were stupid

20  and, therefore --

21          MR. SCARPONE:  Not that they were stupid --

22          THE COURT:  -- as a stupid secured creditor or would

23  be secured creditor you can't be paid?

24          MR. SCARPONE:  They were reckless.

25          THE COURT:  Reckless?  In making a loan?

1          MR. SCARPONE:  Yes.  And --

2          THE COURT:  Okay.

3          MR. SCARPONE:  -- reckless to the point where they

4    should -- not that they're not entitled to a claim.  Sure, they

5    have a claim, but they're not entitled to the equitable remedy

6    of foreclosure because they've just gone too far.  They just

7    ignored all normal banking procedures.  That would be the

8    theory.  I don't know that those facts are true, Judge.  That's

9    why we want the discovery.

10          It's a rather unusual claim.  I would acknowledge

11   that.  Do I have a lot of case law for you at this point in

12   time?  No.  I haven't done the research yet.  I want to find

13   out what the facts are.  But, Judge, for example, the factual

14   example I would look at here is another one that Your Honor

15   just mentioned; the opinion letter from Ben Becker.

16          Now, Merrill Lynch had requested that opinion letter

17   because there was an issue involving certain customs

18   payments -- I'm sorry, I didn't hear that.

19          THE COURT:  I didn't hear anything, so --

20          MR. SCARPONE:  Merrill Lynch requested it.  Mr.

21   Kupperman brings them a letter.  They don't get the letter from

22   Ben Becker, they get it from Mr. Kupperman who says I'll get

23   you an opinion letter from my client -- my counsel, I mean.

24   Apparently, that could happen.  We don't know the particulars.

25   Again, we need the discovery.

1          But, the letter comes to Mr. Kupperman on its face.

2     It's addressed to him, and he delivers it to Merrill Lynch.

3     Does Merrill Lynch call Ben Becker?  No.  Had they called him,

4     they would've known the truth.  And the same principle applies

5     to the accountant's financial statements.  They get an audited

6     financial statement which shows 50 million plus in sales for

7     this company.  Profitable, healthy company.  Did Merrill Lynch

8     ever call the accountant?  No.  I called the accountant as soon

9     as I saw that statement --

10          THE COURT:  Let's assume for argument's sake that you

11     have articulated a cause of action.  I'll sort of skip that

12     whole point.  We'll assume that we've got a new kind of lender

13     liability, recklessness cause of action.  What're your damages?

14     That they gave you money?

15          MR. SCARPONE:  I was asking --

16          THE COURT:  That they gave your predecessor money?

17          MR. SCARPONE:  But, you see, Your Honor mislabeled my

18     cause of action and thereby distort it.

19          THE COURT:  Go ahead.

20          MR. SCARPONE:  It's now a lender liability claim.

21     All I'm doing is saying this is an application to have them

22     come in and prove the validity and enforceability of their

23     lien.  Then we'll fight about who owns the assets that are

24     currently being attacked by Merrill --

25          THE COURT:  Are there assets?  Well, that's what I

1  wanted to know.  Are there --

2           MR. SCARPONE:  They've attached things.  Merrill has.

3  So has Chase.  There are assets that have been attached --

4           THE COURT:  Assets in this debtor or claimed by

5  this --

6           MR. SCARPONE:  Not in the debtor --

7           THE COURT:  -- claimed by the debtors?

8           MR. SCARPONE:  No, no, no, no.  These are assets that

9  would be the subject of our (indiscernible) transfer action.

10  They're assets of PGB International, the other entity that

11  Arthur Kupperman set up.  The one that borrowed from Chase.

12           THE COURT:  And where is that cause of action?

13           MR. SCARPONE:  That's before Judge Cavanaugh.

14           THE COURT:  And the trustee's a party to that?

15           MR. SCARPONE:  No.  The trustee's not a -- we have --

16  there are two causes of action.  There's one in this court,

17  that's the trustee's cause of action against PGB.

18           THE COURT:  Okay.

19           MR. SCARPONE:  Then there is the cause of action

20  brought by the two banks; by Merrill and by Chase.  I don't

21  know whether it's two separate cases -- I believe it is --

22  before Judge Cavanaugh in the district court in which they have

23  obtained writs of attachment and other extraordinary remedies.

24           THE COURT:  All right.  So, your request for relief

25  would be a function of knocking out their lien in this case in

1  the adversary proceeding in the bankruptcy is premised on

2  Merrill Lynch disregarding all of its own guidelines and

3  recklessly or worse, making a loan to the debtor?

4        MR. SCARPONE:  Now, that would not disallow their

5  claim, and it wouldn't be a cause of action for damages against

6  them because they have -- they did loan the money.  All we

7  would say is they're not entitled to the equitable remedy of

8  enforcing their lien of foreclosure on their lien.

9        Now, to the extent that we can trace the assets

10 through to PGB and say those were really the assets of Pittra,

11 they would not come ahead of us -- not come ahead of the

12 trustee.  And the trustee would be able to assert for the

13 benefit of the creditors of Pittra.  The case has a history

14 that I think cannot be ignored, Judge, and that is that for a

15 couple of years before the bankruptcy was filed there was

16 pending fraudulent transfer litigation brought by these two

17 major creditors, Empresas Lourdes.  And only when that

18 litigation started getting to the point where the plaintiff

19 started proving their claims, then all of a sudden there was a

20 bankruptcy petition.

21       Oddly enough, Yenti and Empresas Lourdes withdrew

22 their case, recognizing that the trustee would pursue the

23 assets.  This is one of a more serious points with the motion

24 to dismiss which, of course, Your Honor's already ruled on and

25 I'm not rearguing it.  But, they withdrew it in reliance of

1  this proceeding and now dismiss this proceeding, and where were

2  they?  And the answer is barred by a statute of limitations.

3          Factually, this is, shall we say, an interesting case

4  which means, usually, messy.  Difficult beyond a level at which

5  it can be economically and efficiently handled.  As Mr. Hirsch

6  said, on its face right now it's a no-asset case.  Does that

7  mean a really smart trustee just walks away from it and says,

8  eh?

9          THE COURT:  Well, see, that's why I brought up the

10  rabbit because I asked early on whether the trustee was

11  carrying the water for Merrill Lynch, and that caused Mr.

12  Hirsch to pop up and say look, let's develop the pot first, the

13  rabbit, and then we'll decide how to divide it.  And I thought

14  that that would generate some light and some kind of

15  arrangement that would avoid all the expense, or much of it, or

16  put it on a party that had great assets, Merrill Lynch, in

17  favor of their pursuing a position.  But, apparently, there's

18  just World War III and there's no coming together.

19          MR. SCARPONE:  Let me address that, Judge, because it

20  is a central point in this case.  That's what I thought, also.

21  That's what the trustee thought.  We all thought that.  And it

22  wasn't just Merrill, it was Chase also because they had been

23  defrauded also in a different way.  And it was the trustee who

24  started the real discovery here, who started uncovering the

25  facts and then we investigated further.  And as soon as we

1  learned these things we immediately notified Merrill and Chase.

2  When I say learned these things, I mean about the fraudulent

3  financials, et cetera.

4       We were told -- and just as Your Honor has said, and

5  it made perfect sense -- let the two banks pursue the more

6  aggressive remedies that they can afford to pursue and that

7  they have to pursue.  They've both been defrauded.  And were

8  assured, don't worry.  We won't forget the trustee.  We won't

9  forget Yantai and Empresas Lourdes who carried the ball for two

10 years before the bankruptcy was filed while the fraud was being

11 perpetrated on Merrill and Chase.  It was Yantai and Empresas

12 Lourdes who were litigating with Arthur Kupperman and Pittra

13 and PGB to try to get these assets back where they should be,

14 paying the creditors that should've been paid years ago.

15      So, we were assured, sure, let's see if we can

16 recover anything here.  And recovery always meant recovery from

17 the individuals, including Paulette Krellman and Ross Brown, as

18 well as Arthur Kupperman.  And that's -- Mr. Brown is

19 represented by Mr. Papalia here.  And those discussions have

20 progressed.  And we've been on the fringe of them, so to speak.

21 And I've spoken to Mr. Hirsch, to John Longhist (phonetic) and

22 the people from Herrick Feinstein who represent Chase with Mr.

23 Papalia.  There's Fred Pollock (phonetic) who represents

24 Paulette Krellman.  No one has made any significant progress

25 with Arthur Kupperman or his attorneys, and Mr. Kupperman has,

1  as we say, a bigger profit.  And he's taking the Fifth

2  Amendment as to virtually everything.  Well, never mind the

3  virtually.

4          THE COURT:  Well, what's on for trial on the 13th and

5  14th?

6          MR. SCARPONE:  That is our fraudulent transfer case.

7  That's the case that we've picked up from Yantai and Empresas

8  Lourdes.

9          THE COURT:  Right.  Is that ready to go forward?

10          MR. SCARPONE:  Not really, Judge.  I have a

11  deposition scheduled for tomorrow with Michael Rosenbaum from

12  Budd Larner.  Budd Larner was counsel to Pittra, later to PGB,

13  also Mr. Kupperman.  In fact, there's a family relationship

14  between Mr. Kupperman and Mr. Rosenbaum.  I believe they're

15  cousins.  And since we can't get any testimony out of Mr.

16  Kupperman, we'll try this other avenue to find out whether

17  there are assets.

18          What happened to all the money?  I mean, between

19  Merrill and Chase, $7 million -- more than seven.  Seven and a

20  quarter I believe is the outstanding balance between the two of

21  them -- went into this company and there were sales and there

22  was cash flow.  What happened to it all?

23          THE COURT:  The case that is on for trial this month

24  runs to one degree or another on the same track or parallel to

25  what you're presenting to Judge Cavanaugh.  Is that the case,

1  or not at all?  There's no --

2          MR. HIRSCH:  The -- first of all, the Empresas

3  Lourdes did not dismiss their fraudulent conveyance action, and

4  they, in fact, went to Judge Cavanaugh, literally copying the

5  papers that Michael Connolly and I had prepared at our office

6  and got their own writs of attachment.  Just took our brief and

7  put different names in.  But, our writs are primarily against

8  the individuals.  We don't think PGB has anything.  Chase had

9  the first lien there, and that's all been liquidated and they

10  got something.

11          THE COURT:  My question is really designed --

12          MR. HIRSCH:  But, the -- but, it's not the same, but

13  our case is -- we got -- we have summary judgment on the

14  guarantees.

15          THE COURT:  I got you.  But, let me just try this.

16          MR. HIRSCH:  We're --

17          THE COURT:  Let me just try this.  Let me just try

18  this on for size because, you know, you made the point which is

19  you made it in, you know, a different way, but how much time

20  and money is going to be spent on this and, you know,

21  particularly the trustee.  You know the position the trustee's

22  in.  Is there any reason for this Court to try to knit you

23  together in a settlement at this time, or am I, you know, is it

24  just a pipe dream?

25          MR. HIRSCH:  Well, Your Honor, Mr. Papalia has been

1  partaking of that pipe for quite some time with Magistrate

2  Arleo who has offered, and in fact, told us that she intends to

3  try to do that if there's no reason not to come the next status

4  conference which is by telephone on the eighteenth.  She's

5  going to set a date to try to do that.

6          But, the problem is that -- from my client's point of

7  view -- the trustee is looking for two big a portion of a pot

8  that a) doesn't quite exist yet, and b) is a whole lot smaller

9  than, you know, everybody would hope, and --

10          THE COURT:  But, that's just a matter of formula

11  and --

12          MR. HIRSCH:  Right.

13          THE COURT:  -- and it seems to me, rather than, for

14  example, I don't know how you view this deposition that will be

15  taken tomorrow in terms of substance in your case.  You may say

16  it has no meaning at all.  But, maybe it does, and here you've

17  got competent counsel -- more than competent counsel.  You've

18  got someone who just won't give up and knows what he's doing,

19  and that transcript may well benefit you.

20          Now, I'm not asking you to pay for it.  I'm just

21  asking you to consider that kind of cooperation.  And the

22  trustee, in standard bankruptcy fashion, is asking for

23  recompense.  And if it's in a formula, why not?  And --

24          MR. HIRSCH:  Your Honor, we would -- and we've --

25  what's going on here is, we have a motion to compel, and we're

1  being asked --

2          THE COURT:  To compel settlement.

3          MR. HIRSCH:  No, but --

4          THE COURT:  Okay.  I misread it.

5          MR. HIRSCH:  Well, you have a motion to compel, and

6  the motion is asking for something that there's no conceivable

7  way it could bear on anything, whether or not -- you know, what

8  our -- we gave them all the loan documents, the entire credit

9  file, the underwriting file.

10          THE COURT:  I'm more than willing to talk about the

11  motion --

12          MR. HIRSCH:  Okay.

13          THE COURT:  -- and to decide the motion.  But, before

14  we sort of get to that issue which may be the lesser important

15  issue, I'm, you know, what're we doing here?

16          MR. HIRSCH:  I'll tell you the unfair position you're

17  putting me in.

18          THE COURT:  Go ahead.

19          MR. HIRSCH:  The unfair --

20          THE COURT:  I'll hear you.

21          MR. HIRSCH:  -- position you're putting me in is that

22  to the extent that I seem resistant to being cooperative.

23  Whether or not my resistance is well grounded, that plants deep

24  in the recess of a human being, which you are, subconscious, a

25  sort of, well, maybe if I push this way, and it disadvantages

1  me on the issue of the motion.  And that's the very reason --

2            THE COURT:  Let me disabuse you, then.  I'll disabuse

3  you.

4            MR. HIRSCH:  Fine.

5            THE COURT:  I'm going to deny his motion.

6            MR. HIRSCH:  Okay.

7            THE COURT:  I'm denying his motion --

8            MR. HIRSCH:  We're always happy --

9            THE COURT:  -- period.

10            MR. HIRSCH:  We're always happy to talk to try to

11  resolve things, but my client's reaction to the trustee's

12  demand was, it's not in the ballpark.

13            THE COURT:  Just the way I denied your motion.

14            MR. HIRSCH:  It's not in the ballpark.  What the

15  trustee was looking for was --

16            THE COURT:  But, now we've -- now you've -- now let's

17  sort of get to the (indiscernible).  Mr. Papalia, you had --

18            MR. HIRSCH:  Are we going to go off the record?

19  Because if --

20            THE COURT:  No, no.  We're not off the record.

21            MR. HIRSCH:  Well, then, I can't put numbers.  I

22  can't say what he demanded and --

23            THE COURT:  And I don't want you to.  Mr. Papalia,

24  anything that you want to add to this by way of calming oils?

25            MR. PAPALIA:  Yes, Your Honor.  Your Honor, I was

1  here for two reasons; because there's a trial scheduled on the

2  13th and the 14th, and the other reason was in the hope that we

3  could get everyone together to have a settlement discussion

4  and, on behalf of Mr. Brown, and I know I speak for the other

5  defendants, we would welcome the Court's involvement, or as Mr.

6  Hirsch said, Judge Arleo has scheduled a conference for the

7  eighteenth which was based in part on the resolution of the

8  motion to dismiss, or how it was resolved, and now it's been

9  resolved.  And she indicated a willingness to conduct a

10  settlement conference with all parties, and if it was okay with

11  the parties, to invite the trustee.  And I think that's what

12  has to happen off the record, on the record.

13          THE COURT:  Okay.  But, let me say this so that

14  we -- fine.  And I appreciate it.  And I certainly am grateful

15  to Judge Arleo for her involvement.  The fact that I'm denying

16  the motion is on -- is not an indication of how I would rule on

17  that motion in an adversary proceeding with respect to an

18  application for exactly the same guidebook or whatever you want

19  to call it -- their handbook or access to that same, or if it's

20  not an identified, a class of bank officer.

21          MR. HIRSCH:  It's not an indication either way, I

22  take it.

23          THE COURT:  That's right.

24          MR. HIRSCH:  Okay.

25          THE COURT:  And so, if you're going to push Mr.

1  Scarpone to file that adversary proceeding, the chips are going

2  to fall where they fall on discovery.  Again, it seems to me

3  that cooler heads ought to prevail.  And I truly believe that

4  we have only cool heads here.  And so, you people are going to

5  at least make your best effort to resolve it.  And nobody's

6  putting a gun to anybody's head.  It is what it is.  It hasn't

7  changed dramatically since the argument on the initial

8  pleadings.

9       But, I must say that at that time, I anticipated that

10 there'd be some sensible cooperation between Merrill Lynch and

11 the trustee, and some understanding of what would happen if

12 there were, and there may never be, a jackpot to divide.

13      MR. HIRSCH:  I think there's one factor that hasn't

14 been mentioned and I'm remiss in not mentioning it, and that is

15 that one of the sort of preconditions to any of that really

16 working out was that Merrill Lynch and Chase got on the same

17 track and we've been cooperative and not really fighting with

18 each other, but we've been unable to get the banks together to

19 finalize --

20      THE COURT:  No, but going back to them with a rousing

21 victory where you, you know, you've won that discovery motion,

22 I'm sure they're going to bend it this time.  You know, you can

23 go back and show them the strength and why you're going to be

24 so influential.  But, that's all I can -- is there anything

25 that the parties want me to do other than just to keep my hands

1   off and leave it to the good offices of Judge Arleo and,

2   presumably, adjourn the 13th and 14th?

3           MR. SCARPONE:  Judge, may I just have one moment?  I

4   want to ask Mr. Papalia a question before I respond to your

5   other question.

6           THE COURT:  Go ahead.  Do you want me to --

7           MR. SCARPONE:  No, just in -- I need, like, a few

8   seconds.

9           THE COURT:  Sure.  Take your time.  This will give me

10  a chance to talk to Ms. Staiano.  How are you?

11          MS. STAIANO:  I'm well, thank you.

12          THE COURT:  Okay.  All right.  Mr. Stanziale is, you

13  know, you're here in the morning, you're here in the afternoon.

14          MR. STANZIALE:  I should've slept outside.

15          THE COURT:  Oh, no.  No, no.  You're -- I think

16  you're lending weight to this side of the table.

17          MS. STAIANO:  And everybody's getting ready for the

18  holidays.

19          THE COURT:  This courthouse is all geared up for

20  parties.

21          MS. STAIANO:  I'm done with cooking, so I'm

22  celebrating.

23          THE COURT:  All right.  We can, just for the moment,

24  go off the record.

25                          (Off the record)

1          MR. SCARPONE:  Your Honor, an issue has come up and I

2     wanted to just discuss it briefly with Mr. Papalia, but there

3     is some history and some relationship between Judge Cox Arleo

4     and Mr. Papalia's firm.  And apparently this has been the

5     subject of comment by counsel, that there might be some lack of

6     complete objectivity, should we say.

7          MR. HIRSCH:  When you say counsel, could you identify

8     the counsel because --

9          MR. SCARPONE:  I don't know.  It's only been told to

10    me that it has been mentioned.  I wasn't there.  What I'm

11    suggesting, Your Honor, is for that reason, it might be better

12    if Your Honor did the settlement discussions here.

13         THE COURT:  Well, here, I'll leave that up to Judge

14    Arleo.  She can be the best judge of that.  I'll do it, but I

15    won't do it without her weighing in on it and she should -- and

16    I'll leave it to her good judgment, which I thoroughly trust,

17    to deal with that issue.  What -- and I'm living at hope I'll

18    adjourn the 13th and 14th.  I'll set it out and

19    re-notice it for the 13th and 14th of February, 9 a.m.

20    Mariela, would you please get Peggy on board with that

21    adjournment?  Mr. Scarpone, if you would notify all parties of

22    that adjournment from 13 and 14 of December to 13 and 14 of

23    February.  But, I'm available, and I'll do what the parties

24    feel is best.

25         MR. SCARPONE:  We'll get back to you as soon as

1  possible, Judge.  I understand what Your Honor is saying.

2  We'll contact Judge Arleo.  I haven't been involved in any of

3  the discussions there.

4          MR. PAPALIA:  Your Honor, if I may, again, on the

5  record of off the record?

6          THE COURT:  Yes.

7          MR. PAPALIA:  The thing is, is that, as Mr. Scarpone

8  says, he's not party to --

9          THE COURT:  No, I understand.

10          MR. PAPALIA:  -- the district court proceeding.  And,

11  therefore, if, you know, there's an issue, I guess, of standing

12  or whatever it is, and you know, we have to contact Judge

13  Arleo, or we will, I know, perhaps maybe the way to deal with

14  it is that it's a joint settlement conference that, you know,

15  Judge -- Your Honor is dealing with the fraudulent conveyance

16  action and the bankruptcy issues, which I'm sure Judge Arleo

17  would appreciate your expertise, and Judge Arleo is dealing

18  with the district court.  And then, hopefully, you know, it

19  doesn't have to be both conducting the settlement conference,

20  but all I'm saying is, that because of procedural issues and

21  because of substantive issues, I think the expertise of

22  knowledge of both Courts would be helpful.  That's all.

23          THE COURT:  All right.  Look, you know, I'll do

24  whatever the parties and Judge Arleo feel makes sense.  I don't

25  know how we're going to do that, you know, on a joint basis,

1  but I'll -- look, I'm mobile.  I'll even walk downstairs.  I'll

2  do whatever is necessary.  But, I think that -- again, I am not

3  exactly clear, and I shouldn't be, on how all the parties would

4  interrelate on a settlement.  But, what I'm focusing on now,

5  not to cut you out of the mix because you appear to be very

6  important, but some sort of a cooperating agreement between

7  Merrill Lynch and, perhaps, Chase and the trustee would

8  streamline the bankruptcy case.  And again, if --

9        MR. HIRSCH:  Gave you the best possible way to

10  streamline the bankruptcy case, Your Honor, and you declined,

11  so what do you want from me?

12                    (Laughter)

13        THE COURT:  No, I appreciate it.  Okay.  Short of the

14  bankruptcy court going out of business, having said that,

15  anything else?  So, it's both motions are denied, short forms

16  of order would be in order submitted by either side -- the

17  winning side in each case.  Anything else?  All right.  Thanks

18  a lot.  If I don't hear from you have a good holiday.  Enjoy,

19  relax, take care.

20                    *  *  *  *  *

21

22

23

24

25

### C E R T I F I C A T I O N

I, KATHLEEN BETZ, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Kathleen Betz                    DATE:  January 22, 2008

KATHLEEN BETZ

J&J COURT TRANSCRIBERS, INC.